## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## SOUTH BEND DIVISION

| | | |
|---|---|---|
| PLUMROSE (USA) INC., | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | No. 3:04 CV 784 |
| | ) | |
| PENSKE TRUCK LEASING CO., L.P., | ) | |
| and ROLLINS LEASING CORP., | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM AND ORDER

### I. BACKGROUND

This matter is before the court on defendants' motion to dismiss plaintiff's claim

pursuant to FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6). Plaintiff Plumrose seeks

damages for losses it claims it incurred when refrigerated container trucks it leased

from defendants Rollins/Penske[1] to carry meat products across the midwest failed to

function properly. Plaintiff claims that it leased refrigerated containers, called "reefer

units," from defendants on two occasions pursuant to a lease and service agreement

signed on May 4, 1998. (Compl. ¶¶ 3-5; Ex. A). Plaintiff further claims that it loaded and

carried temperature-sensitive meat products in the reefer units from Mississippi to

consignees in Wisconsin, Illinois, and Michigan. (Compl. ¶ 7). Plaintiff alleges that

when it attempted to deliver the products, "part or all of the shipments were refused by

---

[1] Originally, the lease agreement was made between plaintiff Plumrose and defendant Rollins. Rollins has since been acquired by defendant Penske. (Defs.' Mem. Supp. Mot. to Dismiss 1 n.1). Defendants treat themselves collectively as one for purposes of their motion, and so the court does the same for purposes of this order.

the consignees." (Compl. ¶ 8). The shipments were then taken to Elkhart, Indiana, where they were "declared a total loss." (Compl. ¶ 10).

In section 4(A) of the agreement, defendants agreed to maintain and repair the rental vehicles. According to plaintiff, "[i]n breach of its duties and obligations, defendants provided Plumrose with Reefer Units that were not in good repair and condition, and which did not perform the function for which they were intended." (Compl. ¶ 11). Plaintiff alleges that "[d]efendants' failure to properly repair and/or maintain the Reefer Units, and/or defendants' failure to provide a proper working Reefer Unit, was the sole proximate cause of the loss of the meat products carried in the Reefer Units." (Compl. ¶ 12). Plaintiff seeks damages in the amount of $111,629.62. (Compl. ¶ 13).

In their motion to dismiss and accompanying brief (docket # 10, 11), defendants argue that according to the plain language of the parties' contract, defendants cannot be held responsible for the losses alleged by plaintiff. Specifically, defendants argue that subsections (1) and (2) of section 6(C) bar plaintiff's cause of action. (Defs.' Mem. Supp. Mot. to Dismiss 2). Section 6(C) of the agreement consists of the following:[2]

> C. LESSEE SHALL DEFEND, INDEMNIFY AND HOLD HARMLESS ROLLINS AND ROLLINS' OFFICERS, DIRECTORS, SHAREHOLDERS, EMPLOYEES, AGENTS AND REPRESENTATIVES FROM AND AGAINST ANY CLAIM, CAUSE OF ACTION, DAMAGE, LIABILITY AND EXPENSE (INCLUDING

---

[2] To facilitate the court's analysis, the enumerated subsections of section 6(C) are presented here in list form. In the actual lease agreement, the subsections were strung together in one paragraph.

2

REASONABLE ATTORNEYS' FEES), EVEN IF ROLLINS IS CLAIMED TO
HAVE BEEN OR PROVEN TO BE NEGLIGENT, ARISING OUT OF:
    (1) LOSS OR DAMAGE TO ANY CARGO, GOODS OR OTHER
PROPERTY PLACED IN OR CARRIED ON ANY VEHICLE(S) WHETHER
SUCH LOSS OR DAMAGE OCCURS IN ROLLINS' FACILITY OR
ELSEWHERE;
    (2) LOSS OR DAMAGE RESULTING TO LESSEE BY REASON OF
DELAY IN DELIVERY OR FAILURE TO DELIVER PRODUCTS OWNED OR
TRANSPORTED BY LESSEE OR ANY OTHER CONSEQUENTIAL OR SPECIAL
DAMAGES;
    (3) LOSS OR DAMAGE (INCLUDING FINES) RESULTING FROM THE
TRANSPORTATION OF "HAZARDOUS MATERIALS" (AS THAT TERM IS
DEFINED BY THE FEDERAL HIGHWAY ADMINISTRATION DEPARTMENT
OF TRANSPORTATION OR THE FEDERAL OR ANY STATE
ENVIRONMENTAL PROTECTION AGENCY) OR SPILLS THEREOF
INCLUDING ALL FLUIDS CONTAINED IN VEHICLE(S); AND
    (4) LOSS OR DAMAGE INCURRED BY ROLLINS FROM LESSEE'S USE
OF A VEHICLE(S) NOT OWNED OR INSURED BY ROLLINS, REGARDLESS
OF ROLLINS' OBLIGATIONS IMPOSED BY THE INSURANCE PROVISIONS
OF THE MOTOR CARRIER ACT OF 1980 OR OF THE ICC OR ANY STATE
AGENCY.

In its response to defendants' motion, plaintiff contends that "it was never the

intent of the contracting parties for the lessee (Plumrose) to defend the lessor

(Penske/Rollins) from direct actions between them," but rather only from third-party

claims. (Pl.'s Response to Defs.' Mot. to Dismiss 3). Defendants insist in their reply that

the indemnification clause, which states that plaintiff must hold defendants harmless

for "any claim," applies to claims between the parties, unless a third-party limitation is

present in the contract's language. (Defs.' Reply 2-3). According to defendants,

plaintiff's interpretation of the clause imposes an impermissible gloss on the literal

language of the contract. (Defs.' Reply 2-3).

## II. LEGAL STANDARD

A cause of action will be dismissed pursuant to FEDERAL RULE OF CIVIL
PROCEDURE 12(b)(6) for failure to state a claim only if there is no set of facts consistent
with the allegations of the complaint that could be proved which would entitle the
plaintiff to relief. *Brown v. Budz,* 398 F.3d 904, 908-09 (7th Cir. 2005). The court will
accept as true all of the well-pleaded facts alleged by the plaintiff and all reasonable
inferences that can be drawn therefrom. *Horowitz v. Bd. of Educ. of Avoca Sch. Dist.
No. 37,* 260 F.3d 602, 618 (7th Cir. 2001).

The court must decide whether portions of the indemnification provision in the
parties' contract require plaintiff to "defend, indemnify, and hold harmless" defendants
for a lawsuit brought by plaintiff itself, thus effectively barring plaintiff's cause of
action. The parties agreed that the contract should be interpreted according to Delaware
law. (Defs.' Mot. to Dismiss, Ex. A, section 13). Courts in other jurisdictions[3] have
addressed the issue of whether a broadly worded indemnification agreement, requiring
indemnification for "all" or "any" claims or costs of litigation, should be presumed to
include or exclude claims or costs of litigation between the parties (also known as "*inter*

---

[3] For example, compare *Ray D. Baker Contractor, Inc., v. Chris Nelsen & Son, Inc.,*
136 N.W.2d 771, 773 (Mich. App. 1965) ("This type of clause has traditionally been used
to indemnify one of the contracting parties against tort liability to third parties. . . The
defendant's attempt to use what is a commonly encountered indemnity clause as a
defense to its own breach of contract is an ingenious argument, but one which we
cannot accept."); with *Edward E. Gillen Co. v. United States,* 825 F.2d 1155, 1156-57 (7th
Cir. 1987) ("The provision explicitly applies to 'all suits.' It is inappropriate for the court
to read in a clause, such as 'all suits, except those brought by the contractor.' The Court
cannot add terms to an agreement.").

*se*" or "inter-party" claims). However, the Delaware courts have not created a definitive

rule on this issue. Nevertheless, the Seventh Circuit advises that federal courts should

not shy away from deciding issues of state law. *Diginet, Inc. v. Western Union ATS, Inc.,*

958 F.2d 1388, 1395 (7th Cir. 1992) ("Some federal judges are timid about deciding issues

of state law, because they fear that by doing so they will confuse that law. The fear is

groundless."); *Erie Ins. Group v. Sear Corp.,* 102 F.3d 889, 892 (7th Cir. 1996) (holding that

absence of state supreme court precedent did not justify certification of a question to

that state's supreme court where the court could forge a holding out of general

principles of contract interpretation and other persuasive caselaw). As a federal court

sitting with diversity jurisdiction over this case, the court's role is to predict what

decision the Delaware Supreme Court would make if it were confronted with this issue.

*McKenna v. Ortho Pharm. Corp.,* 622 F.2d 657, 661 (3d Cir. 1980); *see also Estate of Kuba by*

*Kuba v. Ristow Trucking Co.,* 660 F. Supp. 1069, 1073 (N.D. Ind. 1986).

    As a preliminary matter, it is important to note that cases related to this issue

come in three basic flavors. First, the courts distinguish between indemnification for the

costs of attorneys' fees and legal expenses, and indemnification for other costs,

including, for example, damages and arbitration awards. Under the umbrella of

indemnification for attorneys' fees and legal expenses, the courts further distinguish

between indemnification for attorneys' fees and legal expenses incurred in defending a

"substantive" cause of action (e.g., for fraud or breach of contract), and those incurred

in bringing suit to enforce the indemnification agreement itself, also known as "fees on

fees."[4] In the case at hand, defendants' motion to dismiss is not a request for indemnification for attorneys' fees and legal expenses, but rather it falls under the category of a request for "other costs." More accurately, defendants argue that plaintiff's suit is barred altogether. Nonetheless, a discussion of the rules associated with the other genres of indemnification claims is warranted in order to better understand the reasoning behind the rule that the court believes applies to this case.

*A. Indemnification for "fees on fees"*

The Delaware Supreme Court settled any doubts about its policy on "fees on fees" in *Pike Creek Chiropractic Center v. Robinson,* 637 A.2d 418, 422-23 (Del. 1994). The court held that the indemnification clause at issue, which was "very broad in scope and require[d] Robinson to hold harmless and indemnify PCCC against 'any liabilities and expenses, including attorneys' fees,'" compelled an award of "fees on fees" because "[the indemnitee] will not be held harmless unless it receives *all* the legal expenses and attorneys' fees it has incurred, including those incurred in enforcing the Indemnification Clause." *Id.* at 423 (emphasis in original). Later, the Delaware Supreme Court similarly held that a broadly worded corporate bylaw providing for indemnification of officers "to the full extent authorized by law" would be construed as including attorneys' fees

---

[4] For example, assume that an indemnitee expended funds defending against a third-party claim, and the indemnitor refused to reimburse these expenses as required by the indemnification agreement. Assume that the indemnitee then brought a second suit to compel the indemnitor to pay, expending fees on this proceeding as well. A prayer for the fees expended in the latter action is known as a request for "fees on fees."

and expenses resulting from an action brought to enforce the indemnification bylaw itself, unless the parties provided otherwise in their agreement. *Stifel Fin. Corp. v. Cochran*, 809 A.2d 555, 561 (Del. 2002).

Courts interpreting Delaware law show continued adherence to the principles set forth in *Pike Creek* and *Stifel*. *See, e.g., DRR, LLC, v. Sears, Roebuck, & Co.*, 949 F. Supp. 1132, 1143 (D. Del. 1996) (refusing to award "fees on fees" because other language in the contract strongly indicated that third-party claims were the only ones contemplated by the parties when they agreed to the indemnification clause); *Fasciana v. Elec. Data Sys. Corp.*, 829 A.2d 160, 182 (Del. Ch. 2003) (holding that corporate official who brought suit to enforce an indemnification clause providing for advancement of legal expenses was entitled to "fees on fees" ); *Morgan v. Grace,* No. Civ. A. 20430, 2003 WL 22461916, at *4 (Del. Ch. Oct. 29, 2003) (same).

### B. Indemnification for attorneys' fees and legal expenses, generally

The Delaware courts have not ruled on the related issue of whether an indemnification clause should be presumed to require reimbursement for attorneys' fees and legal expenses incurred as a result of "substantive" litigation between the parties (not merely a "fees on fees" action to enforce the indemnification clause). However, the Ninth Circuit, interpreting Delaware law, addressed the issue in *Atari v. Ernst & Whinney, et al.,*981 F.2d 1025, 1031-32 (9th Cir. 1992). In that case, Atari sued the officers of Federated, a corporation Atari was attempting to acquire, for, amongst other

7

things, securities fraud and racketeering. The officers won the case, and sought indemnification from Atari for expenses incurred in defending against the lawsuit brought by Atari. The Ninth Circuit ordered Atari to reimburse the officers for these expenses, concluding that the indemnification agreement was not drafted in a way that would suggest it was limited to indemnification for expenses involving the officers' litigation with third-parties only. The court held that "Atari could have limited its obligation to compensate Federated officers to actions brought by third parties, but it did not. Instead, it agreed to indemnify the officers against 'all acts and omissions' to the extent permitted by law." *Id.* at 1032.

Defendants cite no cases interpreting Delaware law other than *Atari* to support their argument that the indemnification clause at issue should be read to presumptively encompass *inter se* claims. (Defs.' Reply 1-3). Indeed, *Atari* is consistent with Delaware law to the extent of its holding, but, nevertheless, the court finds that *Atari* does not stand for the proposition attributed to it by defendants. Defendants fail to cite the part of *Atari* that mandates a much more narrow reading: "Public policy may prohibit one party from contracting out of its liability to another for intentional torts. But exoneration for fraud is not the issue here. The issue is whether Federated could contract to have Atari indemnify its officers *for their legal expenses* incurred defending a lawsuit brought by Atari, in which the officers were found to be not liable. We are aware of no public policy precluding indemnification *under those circumstances*." *Atari,* 981 F.2d at 1032 (emphasis added). Thus, the *Atari* court, keenly aware of its role as a federal circuit

8

court deciding a case involving an unsettled question of Delaware law, made clear that its holding was limited to the factual scenario before it. The court was careful to point out that there might be instances where it would be inappropriate to construe an indemnification agreement as applicable to *inter se* claims, but the case before it was not one of those instances. The *Atari* court emphasized that the officers were seeking indemnification *for legal expenses* and that the officers were found not liable in the suit brought against them by Atari. The court found that these particular facts presented no problems from a policy standpoint that would preclude allowing the indemnification agreement to include the costs of the *inter se* securities fraud and racketeering claim.

Thus, the holdings of *Atari, Pike Creek,* and *Stifel* on the issue of indemnification agreements *for attorneys' fees and legal expenses* can be read together harmoniously. While *Atari* dealt with indemnification for expenses incurred in defending a substantive lawsuit and *Pike Creek* and *Stifel* dealt with indemnification for expenses incurred in enforcing an indemnification agreement ("fees on fees"), the basic premise is the same: a broadly worded indemnification agreement for legal expenses and attorneys' fees will be read to encompass *inter se* claims unless the parties provide otherwise in the agreement. However, these cases do not dispose of the issue before the court today. Defendants are asking not for attorneys' fees and legal expenses, but for dismissal of an entire breach of contract cause of action. Because, as explained below, Delaware precedent points to a presumption *against* construing an indemnification clause as requiring reimbursement for costs resulting from litigation between the indemnitor and

the indemnitee, other than legal expenses and attorneys' fees, the court rejects

defendants' argument that the *Atari* rule should be applied to this case.


C. *Indemnification for "other" costs besides attorneys' fees and legal expenses*

The court is mindful that the Delaware courts have not directly addressed the

issue of whether an indemnification clause should be presumed to require

reimbursement for costs, other than legal expenses and attorneys' fees, incurred in *inter*

*se* litigation. However, the aforementioned *Stifel* decision is a useful and instructive tool

for determining how the Delaware Supreme Court would decide this issue if it were

before that court today. The *Stifel* court, in addition to deciding that indemnification for

"fees on fees" was appropriate in the context of broadly worded corporate bylaws, dealt

with the awkward question of whether an indemnification agreement should be

presumed to require that an indemnitee be compensated by an indemnitor for an

arbitration award that the indemnitee is required to pay to the indemnitor's subsidiary.

*Cochran v. Stifel Fin. Corp.*, No. Civ. A. 17350, 2000 WL 1847676, at *6 (Del. Ch. Dec. 13,

2000), *aff'd in part and rev'd in part*, 809 A.2d 555 (Del. 2002). *Stifel* involved a parent

corporation Stifel Financial, its wholly owned subsidary Stifel Nicolaus, and Robert

Cochran, one of Stifel Nicolaus' former officers. Stifel Nicolaus brought an arbitration

action against Cochran alleging that Cochran had breached his fiduciary duties, as well

as provisions of his employment contract with Stifel Nicolaus that required him to

10

return excessive compensation to the company and repay a promissory note. *Stifel,* 809 A.2d at 556-57.

The arbitrator overseeing the action found in Cochran's favor on the breach of duty claim. However, the arbitrator also found that Cochran had in fact breached his employment contract and awarded Stifel Nicolaus approximately $1.2 million. *Stifel,* 809 A.2d at 557. Stifel Financial's bylaws included a provision promising to indemnify its officers with regard to any suits brought against those officers. With these bylaws in hand, Cochran brought suit against Stifel Financial, asking the court to order Stifel Financial to abide by its promise to indemnify him and pay the $1.2 million arbitration award that Cochran owed to Stifel Nicolaus. *Id.* Because Stifel Nicolaus was a wholly owned subsidiary of Stifel Financial, Cochran's interpretation of the agreement would therefore require the corporation to pay its own subsidiary for Cochran's breach of his employment contract.

The Delaware Supreme Court specifically affirmed the Delaware Court of Chancery's refusal to adopt Cochran's interpretation. *Stifel,* 809 A.2d at 559. The Delaware Court of Chancery found that "[s]uch a conclusion would render the officer's duty to perform his side of the contract in many respects illusory." *Cochran,* 2000 WL 1847676, at *6. The court noted that "[h]ad the parties intended Cochran to be held harmless [for breaches of his contract with Stifel Nicolaus] through indemnification by Stifel Financial, surely it would have been clearer to simply state that." *Id.* The court found that Cochran's interpretation "subverts the contractual arrangement" and "leaves

Stifel Nicolaus without a genuine remedy against Cochran." *Id.* at *7. The court further pointed out that "Cochran is a sophisticated businessman and cannot have rationally believed that Stifel Financial would indemnify him if he breached his own contractual obligations to Stifel Financial's corporate child, Stifel Nicolaus." *Id.*

The court is aware that several nuances of *Stifel* make it factually different from the present case. First, *Stifel* involved corporations and their promises to indemnify their officers and directors, necessarily invoking complexities and intricacies of corporate law that are not at issue in this case. Nonetheless, since the Delaware courts have not ruled on the precise issue involved here, the principles underlying the *Stifel* holding are of great significance in attempting to determine how the Delaware courts would approach this problem by analogy. Second, the *Stifel* case is not the "purest" form of *inter se* litigation, because the purported indemnitor (Stifel Financial) was not technically the same as the party in the substantive breach of contract dispute (Stifel Nicolaus). Nonetheless, the chancery court's opinion suggests that the parent-subsidiary relationship was a major reason why Cochran's argument failed; the court was unwilling to accept a result where the corporation would be required to pay its own subsidiary for Cochran's breach of contract, unless the language of the agreement made it clear that such was the parties' intent. Based on the reasoning of the *Stifel* decisions, the Delaware courts would likely respond as incredulously, if not more so, if the case involved a "pure" *inter se* claim, where a party would be required to pay itself.

12

Accordingly, it is the opinion of this court that the Delaware Court would extend the logic and reasoning underlying *Stifel* to presumptively reject construing a broad indemnification agreement as including costs of *inter se* litigation, other than attorneys' fees and legal expenses, particularly when doing so would effectively eviscerate other contractual duties and produce a result where a party is essentially required to pay his own damages for the other party's breach of contract. However, the Delaware Supreme Court might recognize a provision producing a pay-your-own-award result, however awkward it might be, if the parties simply state their willingness to abide by such an arrangement in the contract.

### D. Reconciling the rules

The holdings of *Atari, Pike Creek*, and *Stifel* could be read to present sharply contrasting presumptions. On one hand, *Atari* and *Pike Creek* represent a presumption in favor of interpreting indemnification agreements as including *inter se* legal expenses and attorneys' fees. However, at the same time *Stifel* represents a presumption against interpreting an indemnification agreement as covering awards owed by an indemnitee to the indemnitor's subsidiary, a situation that is strikingly similar to *inter se* litigation. Despite the contrast, both rules fit squarely under Delaware precedent.

The *Stifel* court's holding that broadly worded indemnification agreements for legal expenses and attorneys' fees will be interpreted literally is an extension of the already well-settled principle of Delaware law that parties may agree to shift fees

13

amongst themselves. While Delaware adheres to the "American rule," whereby each party generally bears his own costs of litigation, *Montgomery Cellular Holding Co. v. Dobler,* 880 A.2d 206, 227 (Del. 2005), the Delaware courts have held that it does not violate public policy for parties to agree by contract that one party will pay the *legal fees* of the other, even in the event of his own breach. *See, e.g., Clark v. Equitable Life Assurance Soc.,* 316 A.2d 554, 555 (Del. 1974); *Petition of Warrington,* 179 A. 505 (Del. 1935). Indemnification for legal expenses and attorneys' fees related to *inter se* litigation is very similar, if not functionally identical, to fee-shifting. Thus, considering Delaware precedent, it makes perfect sense that if parties choose to take advantage of their legal right to shift fees amongst themselves, the court will not view the agreement as against Delaware public policy, and the parties will be bound by the literal agreement they have made.

In contrast, a rule presumptively interpreting a broadly worded general indemnification provision to encompass *inter se* judgments and awards would not be in line with Delaware policy and precedent. The Delaware Supreme Court reviewed cases involving different types of exoneration clauses, and concluded that "[t]hose decisions demonstrate the policy of this Court to look with disfavor upon clauses which exonerate a party from the consequences of his own negligence or that of his agent. The contract must clearly and unequivocally spell out the intent to grant such immunity. If the language used can be construed as not conferring immunity, it will be so interpreted. This policy was enunciated as the law in Delaware in [1921], and has been

14

followed ever since." *Blum v. Kauffman,* 297 A.2d 48, 49 (Del. 1972) (internal citations omitted). Thus, the Delaware courts have a longstanding tradition of requiring that parties make clear their intent to absolve a party from his responsibilities. Additionally, a presumption in favor of interpreting a broadly worded general indemnification provision to encompass *inter se* judgments and awards could result in an interpretation where the indemnification provision would essentially nullify other duties and obligations in the contract. That is, if a party makes a promise in a contract, but will be indemnified from any financial responsibility resulting from a breach of that promise, the party has really made no promise at all. The words constituting those promises in the contract would have no meaning and serve no function. This would be contrary to the Delaware rule of contract interpretation that requires that courts attempt to give effect to all of a contract's terms, leaving no provision illusory or meaningless. *E.I du Pont de Nemours v. Shell Oil Co.,* 498 A.2d 1108, 1113 (Del. 1985); *Seabreak Homeowners Ass'n, Inc. v. Gresser,* 517 A.2d 263, 269 (Del. Ch. 1986), *aff'd*, 538 A.2d 1113 (Del. 1988). Thus, it follows that if parties wish to make an agreement whereby a party will indemnify another party, even for an award of damages resulting from litigation between them, the parties should explicitly state this in the contract and the court will not assume that such an arrangement was intended by a general, broadly worded indemnification clause. The court is convinced that the Delaware Supreme Court was fully aware of the fact that its decision in *Stifel* created contrasting presumptions and that this was intentional and in line with precedent in that state.

## III. ANALYSIS

The court now turns to how the indemnification clause at issue fares under the rule this court has fashioned based on Delaware precedent. In this case, plaintiff's duty to defend, indemnify, and hold harmless defendants arises in four situations described in section 6(C) of the lease agreement. Given the structure of section 6(C) and the separate enumeration of each scenario triggering the plaintiff's duty to indemnify, the court will consider each subsection of section 6(C) to be its own independent agreement to indemnify. However, the court will analyze these subsections in the context of section 6(C) and the contract as a whole to determine the meaning of the subsections. *Shell Oil Co.*, 498 A.2d at 1113.

Under Delaware law, "[t]he proper interpretation of language in a contract, while analytically a question of fact, is treated as a question of law." *Pellaton v. Bank of New York*, 592 A.2d 473, 478 (Del. 1991) (citing *Klair v. Reese,* 531 A.2d 219, 222 (Del. 1987)). When interpreting a contract, the goal of the Delaware courts, and the goal of this court when considering a contract governed by Delaware law, "is to ascertain the intent of the contracting parties based on the contract terms." *Hercules, Inc. v. AIU Ins. Co.,* 784 A.2d 481, 489-90 (Del. 2001). However, "the Delaware courts should not destroy or twist . . . language under the guise of construing it." *O'Brien v. Progressive Northern Ins. Co.,* 785 A.2d 281, 288 (Del. 2001) (internal quotation marks omitted). Further, a court may not manipulate clear and unambiguous contract language to create a "more perfect contract that the parties never agreed to." *E.I. du Pont de Nemours & Co. v.*

16

*Admiral Ins. Co.*, 711 A.2d 45, 57 (Del. Super. 1995). As explained in detail above, the parties will not be deemed to have contemplated requiring an indemnitor to pay his own award for an indemnitee's breach of contract unless the contract makes it clear that such an arrangement was the parties' intent.

*A. Section 4(A): Maintenance and Repair*

Plaintiff has sued for breach of section 4(A) of the lease agreement, which allocates responsibility between the parties for maintenance and repairs. For example, the provision states that "Rollins shall provide, at Rollins facilities, oil, lubricants, tires, tire replacements, tire repairs, and operating supplies necessary for the proper and efficient operation of the Vehicle(s)." On the other hand, "Lessee shall pay the cost of any anti-pollution and safety devices, including installation expenses, required to be installed on any Vehicle(s) after the execution of the applicable Schedule(s)." For the sake of argument, the court assumes that defendants did in fact breach section 4(A) by failing to provide maintenance and repairs as required. Defendants argue that breach or no breach, the indemnification clause prohibits this suit. (Defs.' Mem. Supp. Mot. to Dismiss 3).[5] However, plaintiff argues that "the provision relied on by defendants,

---

[5] Defendants also argue, as an aside, that defendants fixed the units after they broke down, and therefore defendants did not breach the contract provision in which defendants agreed to maintain and repair the reefer units. (Defs.' Mem. Supp. Mot. to Dismiss 3). The court does not consider this a serious argument for dismissal or summary judgment, as defendants have presented no evidence to substantiate the statement.

Section 6(c) of the LSA [lease and service agreement], provides for indemnity of Rollins in the case of third-party claims, and not for direct actions between the contracting parties for breach of the LSA." (Pl.'s Response to Defs.' Mot. to Dismiss 2).

### B. Section 6: Indemnification

Section 6 of the lease agreement is entitled "Indemnities and Insurance Coverage." Preceding part C are parts A and B, which together deal with automobile liability and delegate responsibility between the parties for claims of bodily injury, death, or property damage arising from the "ownership, management, use or operation of any vehicle." These sections conjure up images of lawsuits that might arise when property has been damaged or a person has been killed or injured in an automobile accident. Part D describes the parties' respective responsibilities in situations involving physical damage and theft, including "collision, upset, fire, theft, malicious mischeif, vandalism, and glass breakage." The theme of part D is damage caused by the lessee's reckless behavior– the lessee is fully responsible for the insurance policy's deductible amount when such damage results because lessee carries hazardous or explosive materials, wilfully causes damage, or drives recklessly or under the influence of alcohol or drugs. Parts A/B and D both require certain types of insurance coverage, and provide that lessee is responsible for any liability and expenses to the extent that the parties' insurance policies fall short of fully satisfying any amount owed, except that

18

Plumrose will not have this responsibility when Rollins' sole negligence is responsible for the loss or damage.

In contrast to parts A/B, and D, part C primarily focuses on items that might be placed or transported in the vehicle and includes no exception to the lessee's liability in cases where Rollins' sole negligence caused the damage. Part C includes four subsections which describe the four instances that trigger the lessee's duty to indemnify. The first subsection of part C provides that the lessee will hold Rollins harmless for any claims arising from "loss or damage to any cargo, goods, or other property." The second subsection states that the lessee will hold Rollins harmless for "loss or damage resulting to lessee by reason of delay in delivery or failure to deliver products owned or transported by lessee, or any other consequential or special damages." The third makes the lessee responsible for any fines arising from the "transportation of 'hazardous materials.'" Finally, the fourth provision requires the lessee to indemnify Rollins for "loss or damage incurred by Rollins from lessee's use of a vehicle(s) not owned or insured by Rollins." The first three subsections focus on the lessee's obligations when losses or damages occur that are related to cargo placed in or carried in the vehicle by the lessee. As stated previously, defendants argue that the first two subsections bar plaintiff's breach of contract claim. (Defs.' Mem. Supp. Mot. to Dismiss 2).

*C. The scope of Section 6(C)*

The court cannot accept plaintiff's argument that "[c]ommon sense dictates that it was never the intent of the contracting parties for the lessee (Plumrose) to defend the lessor (Penske/Rollins) from direct actions between them." (Pl.'s Response to Defs.' Mot. to Dismiss 2). On the contrary, common sense demands otherwise, at least with regard to section 6(C)(2). In this clause, plaintiff promises to defend, indemnify, and hold harmless Rollins from and against any claim arising out of "loss or damage resulting to lessee by reason of delay in delivery or failure to deliver products owned or transported by lessee or any other consequential or special damages." There is no way to read section 6(C)(2) except that a claim arising out of "loss or damage *resulting to lessee*" would be brought by the lessee, not a third-party. If a third-party were to sue defendants, it would not be for loss resulting to the lessee, it would be for loss resulting to that third-party. It would be an endeavor in creative reading to interpret this statement, clearly articulating "losses or damages resulting to lessee," as somehow referring to the losses or damages resulting to a third-party. The provision does not read "loss or damage resulting"; instead it reads "loss or damage resulting *to lessee*." This implicates the lessee, Plumrose, as the only possible plaintiff in a claim arising under this section. The fact that no third-party could function as a plaintiff in one of the scenarios triggering Plumrose's responsibilities to indemnify refutes Plumrose's assertion that the indemnification clause only applies when a third-party brings a claim against Rollins.

20

Thus, the court finds that, based on the contract's plain language, the presumption that the indemnification clause refers to third-party claims only is overcome with respect to section 6(C)(2). Plaintiff must therefore hold defendants harmless for any lost profits or other consequential or special damages incurred as a result of plaintiff's inability to make timely delivery of properly refrigerated meat products to the intended recipients. For two reasons, this holding does not violate the rationale underlying *Stifel* by rendering defendants' contractual obligation to maintain and repair the rental vehicles meaningless. First, a breach of section 4(A) might result in damages beyond those resulting to lessee due to failed or delayed delivery of the cargo. For example, if defendants refused to abide by their part of the deal under section 4(A), leaving plaintiff to purchase replacement tires out of its own pocket, a suit for reimbursement of the cost of those tires would not be barred by section6 (C)(2) because the cost of replacement tires is not a loss resulting to lessee due to delayed or failed delivery of cargo.

Second, the presumption in favor of interpreting indemnification clauses as encompassing third-party claims only still controls section 6(C)(1), which refers to claims arising from "loss or damage to any cargo, goods, or other property."[6] At this point in the litigation, the court is not convinced that the parties intended that plaintiff

---

[6] The difference between the two sections may be slight, but this result is required by the court's reading of the law of Delaware and the language of the contract. Such complexities could have been avoided had the parties more carefully drafted their agreement. As stated previously, a court may not manipulate clear language to create a "more perfect contract." *Admiral Ins. Co.*, 711 A.2d at 57.

would hold defendants harmless for claims arising from "loss or damage to any cargo, goods, or other property," brought by plaintiff itself. Unlike section 6(C)(2), the clause does not include same clear language signaling the parties' intent that the lessee would hold Rollins harmless for that type of claim brought by the lessee. The words "to the lessee," which so clearly indicate that section 6(C)(2) was meant to reach *inter se* litigation, is not used as an umbrella term to apply to all the enumerated clauses of section 6(C). Those words are limited to section 6(C)(2), and therefore the court will not apply them to section 6(C)(1). Accordingly, a cause of action for breach of section 4(A) might include an *inter se* claim for damages for "loss or damage to any cargo, goods, or other property," which would not be barred by the indemnification clause. In this way, not all suits brought by the lessee for damages due to breaches of section 4(A) are barred by section 6(C). Thus, section 4(A) is not rendered meaningless by interpreting section 6(C)(2) as prohibiting suit by plaintiff to recover any losses incurred due to the fact that plaintiff was unable to deliver cargo.

## IV. CONCLUSION

While the court holds that section 6(C)(2) encompasses *inter se* litigation, defendants' motion to dismiss is nevertheless denied. Defendants have not met their burden on this motion to dismiss to convince the court that plaintiff states no claim. When reviewing a motion to dismiss under FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6), the court's review is limited to the pleadings. All factual inferences are to be made in

22

the non-movant's favor. *Horowitz,* 260 F.3d at 618. It is not clear from the pleadings that the entirety of the damages alleged by plaintiff in paragraph 13 of the complaint is attributable to delayed or failed delivery of cargo, or other losses prohibited by section 6(C)(2). As explained above, a breach of section 4(A) could result in damages other than those associated with the failed or delayed delivery of that cargo. Because defendant has not shown that plaintiff's prayer for damages addresses only damages prohibited by section 6(C)(2), and a reasonable inference can be made that other permissible damages have been alleged, defendants' motion to dismiss for failure to state a claim (docket # 10) is **DENIED**.

**SO ORDERED.**

**ENTER:** September 30, 2005

s/ James T. Moody_____
JUDGE JAMES T. MOODY
UNITED STATES DISTRICT COURT